**KOHAN & BABLOVE, LLP**
Nicholas Kohan, Esq. (SBN 257134)
20371 Irvine Ave, Ste 110
Newport Beach, CA 92660
Telephone: (949) 535-1241
Fax: (949) 535-1449
Email: nkohan@kbtriallawyers.com

**THE702FIRM**
Michael C. Kane (*pro hac vice forthcoming)*
8335 W. Flamingo road
Las Vegas, NV 89147
Telephone: (702) 776-3333
Fax: (702) 505-9787
Email: mckteam@the702firm.com

**HILTON PARKER LLC**
Geoffrey C. Parker (*pro hac vice* forthcoming)
Jonathan L. Hilton (*pro hac vice* forthcoming)
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Telephone: (614) 992-2277
Fax: (614) 927-5980
Email: gparker@hiltonparker.com

*Attorneys for Plaintiff Caroline V.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

| | |
|---|---|
| CAROLINE V., pseudonymously,<br><br>Plaintiff,<br>vs.<br><br>H & R HOSPITALITY, LLC;<br>SUNRISE UNION INVESTMENTS, LLC;<br>A & J BHAGAT, INC;<br>RAMESH CHUNILAL BHAGAT;<br>NIMESH BHAGAT;<br>ANJANI MANAGEMENT INC.;<br>BHUVNESHWARI CORPORATION;<br>and G6 HOSPITALITY FRANCHISING LLC;<br><br>Defendants. | Case No. : TBD<br><br>Dept. No. : TBD<br><br>**COMPLAINT**<br>**HUMAN TRAFFICKING**<br>**under 18 U.S.C. § 1595**<br><br>**Jury Trial Demanded** |

Plaintiff CAROLINE V., by and through her attorneys, NICHOLAS P. KOHAN, ESQ. of KOHAN & BABLOVE, LLP, JONATHAN L. HILTON and GEOFFREY C. PARKER OF HILTON PARKER, LLC, and MICHAEL C. KANE, ESQ., of THE702FIRM, states as follows:

## PARTIES

1. Plaintiff CAROLINE V. ("**Caroline**") is a natural person residing in Riverside County, California.

2. Due to the sensitive and intimate nature of the issues in this case, Plaintiff asks the Court to enter a protective order (1) permitting her to proceed under the pseudonym "CAROLINE V."; and (2) forbidding the parties from disclosing her identity to third parties without either her consent or the prior approval of the Court.

3. Defendant H & R Hospitality, LLC ("**H&R"**) is a California limited liability company with its principal place of business in Los Angeles County, CA. On information and belief, at all relevant times, H&R owned and operated the Moonlight Inn (the "Moonlight Inn") located at 15820 S Western Ave, Gardena, CA 90247 and the Sunset Inn (the "Sunset Inn") located at 15824 S Western Ave, Gardena, CA 90247.

4. Defendant SUNRISE UNION INVESTMENTS, LLC ("**Sunrise Union**") is a California limited liability company with its principal place of business in Los Angeles County, CA. On information and belief, in the alternative to the preceding paragraph, Sunrise Union owned and operated the Sunset Inn (the "Sunset Inn") located at 15824 S Western Ave, Gardena, CA 90247 from its formation through the remainder of the relevant period.

5. Defendant A & J BHAGAT, INC. ("**A&J**") is a California corporation with its principal place of business in Los Angeles County, CA. On information and belief, in the alternative to the preceding two paragraphs, A&J operated the Sunset Inn at all relevant times.

6. Defendant RAMESH BHAGAT a/k/a RAMESH C. BHAGAT a/k/a RAMESH CHUNILAL BHAGAT ("**Ramesh**") is a natural person residing, on information and belief, in the State of California. At all relevant times, Ramesh directly owned the Moonlight Inn and the Sunset Inn. On information and belief, Ramesh also co-owned and personally co-operated H&R and Sunrise Union.

7. Defendant NIMESH BHAGAT ("**Nimesh**") is a natural person residing, on information and belief, in the State of California. At all relevant times, Nimesh also co-owned and co-managed H&R and Sunrise Union.

8. Defendant ANJANI MANAGEMENT INC. ("**Anjani**") is a California corporation, with its principal place of business in Los Angeles County, CA. On information and belief, at all relevant times, Anjani owned and operated the Gardena Towers Inn (the "Gardena Towers") located at 16240 S Western Ave, Gardena, CA 90247.

9. Defendant BHUVNESHWARI CORPORATION ("**Bhuvneshwari**") is a California corporation with its principal place of business in Los Angeles County, CA. Bhuvneshwari was the franchisee who owned and operated the Motel 6 Claremont located at 840 S Indian Hill Blvd, Claremont, CA, 91711 ("Motel 6 Claremont") at all relevant times.

10. Defendant G6 HOSPITALITY FRANCHISING, LLC ("**G6**") is a Delaware limited liability company, which, at all relevant times was the franchisor that set—and monitored compliance with—the brand standards for the Motel 6 Claremont ("Motel 6 Claremont") located at 840 S Indian Hill Blvd, Claremont, CA, 91711.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. Plaintiff brings claims arising under the Trafficking Victims Reauthorization Act ("TVPRA") 18 U.S.C. § 1595 which presents a federal question.

12. This Court also has subject-matter jurisdiction under 18 U.S.C. § 1595(a), which expressly authorizes civil actions by victims of trafficking in federal district courts.

13. The Court has personal jurisdiction pursuant over Defendants because they conduct substantial business within California; maintain, own, operate, manage, franchise, supervise, control, or otherwise profit from hotel properties or commercial enterprises located within this District; have purposefully availed themselves of the privilege of conducting activities in California; and engaged in acts and omissions within this District giving rise to Plaintiff's claims.

14. Venue is proper in the U.S. District Court for the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District. Plaintiff was trafficked, exploited, and harmed at hotel properties and/or commercial establishments located in this District, where Defendants

knowingly benefited from participation in a venture they knew or should have known involved trafficking.

## INTRODUCTION

### PIMPOLOGY

15. No little girl dreams of becoming a prostitute. Most girls who do become prostitutes are coerced into it, and even those who aren't coerced at first usually suffer coercion later.[1] Nearly half are still children when they turn their first trick.[2]

16. Individual risk factors for both "consensual" prostitution and sex trafficking overlap almost totally, including in both cases PTSD, trauma, childhood abuse and neglect, substance abuse, poverty and housing instability, foster care or dysfunctional family dynamics.[3]

17. As those familiar with "the Life" know, "most hoes don't even like sex."[4] Rather, they are usually in desperate situations and dealing with unresolved traumas that make them susceptible to manipulation and coercion by traffickers—commonly called pimps—who seek them out and purport to provide them with the love, care, and security that they've been deprived of.

18. Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves. Figures vary, but studies of prostitution in the U.S. find that 80-90% of prostitutes are controlled by pimps.[5]

19. The sex traffickers who exploit these women and girls call themselves pimps, but that is a distinction without a difference—the great majority of pimps use threats and physical violence to keep their "stable" of girls hardworking and loyal.[6]

---

[1] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (coercion increases greatly with time).

[2] Melissa Farley et al., *Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder*, JOURNAL OF TRAUMA PRACTICE, Vol. 2, Issue 3-4 at 40 (2004) (42% of prostitutes in the U.S. started as children).

[3] Gerassi, Lara. "From Exploitation to Industry: Definitions, Risks, and Consequences of Domestic Sexual Exploitation and Sex Work Among Women and Girls." *Journal Of Human Behavior In The Social Environment* vol. 25,6 (2015): 591-605. doi:10.1080/10911359.2014.991055.

[4] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 77 (2008).

[5] Farley, Melissa et al., *Online Prostitution and Trafficking,* ALBANY LAW REVIEW, 1039 (2014), *available at* albanylawreview.org/article/70164-onlineprostitution-and-trafficking. (collecting studies)

[6] *See* Jody Raphael, Jessica Ashley Reichert & Mark Powers, *Pimp Control and Violence: Domestic Sex Trafficking of Chicago Women and Girls*, 20 WOMEN & CRIMINAL JUSTICE 89, 96 (2010) (finding over 75% of pimp-controlled prostitutes said their pimps physically abused them, and under half said they could leave without physical harm.)

20. And physical violence is not the pimp's only tool of coercion. As Ken Ivy, a Milwaukee pimp, explains in his startlingly explicit book *Pimpology: The 48 Laws of the Game*, pimps are also master manipulators, ready to ferret out the weaknesses and pressure points left by a girl's past traumas and use them to create dependence:

> Most hoes have low self-esteem for a reason. A pimp looks for that weakness, and if it isn't on the surface, he brings that motherfucker out of them. . . . Weakness is the best trait a person can find in someone they want to control. You have to tear someone's ego down to nothing before they will start looking to you for salvation.[7]

21. However, even non-violent pimps leverage the ever-present threat of other pimps' violence to coerce women they suspect of being independent sex workers—"renegades," in the language of the Life—into "choosing up" and becoming *their* girls.

22. In his book, Mr. Ivy—a self-proclaimed non-violent pimp—recalls taking control of a naïve sex worker who made the mistake of speaking to him by telling her: "A solo ho without a pimp will soon be under pimp arrest or worse. It's in your best interest to choose a pimp. It's in your best interest to choose Pimpin' Ken."[8]

23. Once a victim is under a pimp's control, standard practice is to take all or nearly all of the money she earns at the end of each night. The pimps spend some of the money to pay for their victims' needs, but only as and when it suits them, creating total dependence on the pimp.[9]

24. Common control techniques include retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to have CPS separate victims from their children if they disobey.

25. Other methods of coercion include withholding food, sleep deprivation, and induced substance abuse/drug addiction. Courts have long recognized these tactics to be methods of coercion used in human trafficking.

26. As Justice William J. Brennan explained, "drug addiction or the weakness resulting from a lack of food, sleep, or medical care . . . would not reappear with such depressing regularity

---

[7] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 22 (2008) ("Law 5: Prey on the Weak").
[8] PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 79 (2008).
[9] *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html; *see also* PIMPOLOGY 20 ("Law 4: Keep a Ho in Arrears . . . To master someone completely, they have to depend on you for everything.")

[in trafficking cases] if they were ineffective." *United States v. Kozminski*, 487 U.S 931, 957 (Brennan, J., concurring) (collecting cases).

27. Of course, pimps use incentives too. Extravagant promises of comfortable retirement are nearly universal, as are shorter-term promises of nice clothes, jewelry, and the like. Follow-through on even the short-term promises is rare, and retirement is all but unheard of.

28. Still, many victims cling to their pimps' fraudulent promises out of a desperate need for something to hope for when all other happy endings seem closed to them.

29. Many victims are also desperate to be loved.

30. A "Romeo pimp" is a sex trafficker who deliberately feigns love and emotion connection to manipulate and control their victims. They knowingly misrepresent the nature of the relationship to induce victims into commercial sexual activity under false pretenses.

31. Notably, these false promises of love, marriage, and retirement are just one of the many tools in a pimp's toolbox. They are not mutually exclusive from—and usually operate in tandem with—other methods of force, fraud, and coercion often including physical violence.

32. All told, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

33. For most women living it, the life of a pimp-controlled prostitute is a hellish prison from which escape seems not just impossible, but unthinkable. Contrary to the popular image, pimp-controlled prostitution is what sex trafficking looks like in America today.

34. Fortunately, federal law recognizes this complex reality. The Trafficking Victims Protection Reauthorization Act ("TVPRA"), at 18 U.S.C. § 1591, defines a human trafficker as:

> Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act.

35. "Coercion," as used in the statute's definition of human trafficking, includes:

> threats of serious harm to or physical restraint against any person; [or] any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm or physical restraint against any person

36. "Serious harm," as used in the statute's definition of coercion, means:

> Any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

37. Reading the TVPRA's criminal provision together with its incorporated definitions, human trafficking means using (or recklessly disregarding the use of) force, fraud, or threats of "any harm" that would be "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person ***of the same background and in the same circumstances*** . . . to continue performing commercial sexual activity."

38. Most American prostitutes—on reference and belief, at least three-quarters—are victims of human trafficking within the meaning of the TVPRA.

39. Few people other than police, prosecutors, and victim advocates think of the average prostitute as a human trafficking victim, but that failure isn't because most people are ignorant of the relevant facts. After all, the phrase "pimp slap" didn't enter the lexicon because people think pimps are cuddly and supportive.

40. Rather, most people fail to see prostitutes as victims because judgmental attitudes toward prostitutes—and dismissive attitudes toward their suffering—are deeply rooted in popular culture. In other words, most people know prostitutes are often coerced, they just rarely care.

41. In this case, Caroline spent around two years under the control of a single trafficker who beat her constantly, leaving visible bruises, kept her isolated, withheld her identification documents, and insisted on controlling every penny she earned so that she remained totally dependent on him. Moreover, he controlled her access to basic needs, including food, clothing, and feminine hygiene products.

42. Sadly, Caroline's story is far from unique—most prostitutes are subjected to similarly coercive treatment. As will be shown in the next section, hotels and hotel workers have

long been intimately familiar with the sex industry. They *know* most prostitutes are victims like Caroline.

43. Contrary to the comfortable myth spread by those who benefit from prostitution occurring on their properties, there is no way to welcome illegal "consensual prostitution" without welcoming sex trafficking.

## HOSPITABLE TO TRAFFICKING

44. Hotels, by their nature, are located near event spaces, airports and highways. They provide temporary, anonymous, private, and relatively inexpensive accommodations that are convenient for travelers.

45. The same qualities also make them attractive venues for human trafficking—and this is not a well-kept secret.

46. For decades, non-profits, governments, academics, and media outlets have reported on the connection between trafficking and the hospitality industry. And hotel companies have long heard the reports.

47. In the late 1990s, international organization ECPAT (End Child Prostitution in Asian Tourism) launched *The Code of Conduct*, an initiative designed to prevent child trafficking in tourism and hospitality. The Code outlines training and policy recommendations for businesses vulnerable to trafficking.

48. By 2012, major hotel and travel corporations—including Wyndham Worldwide Corporation, Delta Airlines, Accor hotels, Hilton Worldwide, the Real Hospitality Group and Sabre—had signed on and pledged to do their part.[10]

49. Defendant G6 signed on to the Code in 2019.

50. Polaris Project, the leading anti-trafficking organization in the United States, has repeatedly documented the prevalence of hotel-based trafficking. In 2014, they published a report that analyzed calls made the previous year to the National Human Trafficking Resource Center.

[10] Tanya Mohn, *The Travel Industry Takes On Human Trafficking,* The New York Times (November 8, 2012), https://www.nytimes.com/2012/11/09/giving/the-travel-industry-takes-on-human-trafficking.html.

The report identified hotels and motels as one of the three most common venues for sex trafficking.[11]

51. Using data from 2007–2012, Polaris also found that 42% of sex trafficking cases involved pimp-controlled prostitution in hotels, motels, streets, or truck stops.[12] Similarly, a 2012 study by BEST (Businesses Ending Slavery and Trafficking) found that 63% of sex trafficking incidents occurred in hotels.[13] The U.S. State Department's *Trafficking in Persons* reports in 2010 and 2012 likewise identified hotels as recurring venues for trafficking.[14]

52. As of 2020, among all active federal prosecutions for human trafficking involving a completed sex act, over three quarters (77%) involved commercial sex at a hotel.

53. Consequently, hotel employees encounter victims of sex trafficking more than members of the general public.

54. Indeed, Polaris emphasized that hotel staff "are in a key position to observe activity that could indicate a potential trafficking situation."[15]

55. Hotel staff can, and should, easily observe and identify the following indicators of in-call escort services involving trafficking victims:

a. Paying for stays in cash or with pre-paid credit cards

b. Extended stays with few possessions

c. Reservations for a single night that are extended day by day

d. Frequent requests for new towels, washcloths, and/or linens

e. Excessive condoms in trash cans

---

[11] *National Human Trafficking Hotline Takes 100,000th Call*, Polaris Project (January 27, 2014), https://polarisproject.org/press-releases/national-human-trafficking-hotline-takes-100000th-call/.

[12] Polaris Project, *Human Trafficking Trends in the United States: National Human Trafficking Resource Center (2007-2012)*, at 15 (Nov. 21 2013), https://polarisproject.org/wp-content/uploads/2019/09/Human-Trafficking-Trends-in-the-US-11-21-13.pdf.

[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, Cornell Hospitality Report 15(15) 6 (Oct. 15 2015) (PDF available at Adopting the Code: Human Trafficking and the Hospitality Industry).

[14] *See* U.S. Dep't of State, *Trafficking in Persons Report 2010: United States of America* 338 (June 14, 2010), https://2009-2017.state.gov/documents/organization/142979.pdf and U.S. Dep't of State, *Trafficking in Persons Report 2012: United States of America* 260 (June 1, 2012), https://2009-2017.state.gov/documents/organization/192587.pdf.

[15] Polaris Project, *Human Trafficking in Hotels and Motels: Victim and Location Indicators* (2012) (PDF available at https://ncjtc-static.fvtc.edu/Resources/RS00002856.pdf).

f. Excessive foot traffic in/out of rooms

g. One person checking in with multiple women in tow

h. Verbal or physical abuse of women

i. Restricted or controlled communications

j. Restricted movement or evidence of constant monitoring

k. No control of money, cell phone, or identification documents

l. Women exhibiting fearful, anxious, or submissive behavior

m. Dresses inappropriate to the setting and/or climate

n. Lack of knowledge of current or past whereabouts

o. Signs of poor hygiene, malnourishment, or fatigue[16]

56. Several of these red flags were present at every hotel in which Caroline stayed.

57. The hotel industry is aware this problem runs rampant in its guestrooms.

58. Since 2015, hundreds of civil sex trafficking lawsuits have been filed against both local hotel franchisees and the hotel franchisors themselves.

59. Defendant G6 has been on notice, since at least 2017, that sex trafficking was occurring at its branded locations, including through publicly reported litigation and settlements alleging such conduct.

60. In response to these lawsuits, several hotel brands—including Motel 6—have mandated anti-trafficking training programs for all employees.

61. At all times during the relevant period, G6 provided anti-trafficking awareness training to its employees at its branded location, including at the Motel 6 Claremont.

62. Prior to rolling out its own training, G6 used a combination of BEST's "Inhospitable to Trafficking" and AHLA's "No Room for Trafficking" training programs to train employees at its branded locations. These training programs contained a substantially similar list of sex trafficking indicators as those identified by the Room Next Door and the Polaris Project.

[16] *Id.* at 71.

63. Upon information and belief, in 2020 or 2021, Defendant G6 mandated that all Motel 6 employees complete its human trafficking awareness training called the "Room Next Door."

64. The course teaches staff members how to recognize and respond to signs of human trafficking and incorporates several red flags from Polaris Project.

65. In particular, G6 trained its staff to recognize and act on the following indicators of human trafficking at its branded locations:

a. Victim avoids eye contact

b. Victim seems, tense, anxious, depressed, or fearful

c. Victim has no suitcase or few personal items

d. Victim is dressed inappropriately for the weather or surroundings

e. Victim seems sleep deprived and unclean

f. Victim is injured, seems abused

g. Victim is monitored closely

h. Victim dropped off at room/property

i. Excessive foot traffic in and out of rooms

j. Individuals lingering outside the room or in hallways, corridors, appearing to monitor the area

k. Wearing the same clothes for multiple days

l. Longer stays with fewer personal items

m. Trashcans filled with used condoms

n. "No Service" requests and requests for new towels/linens

o. Guy checking in with multiple women

p. Trafficker parks car backward to hide license plate

66. Caroline and her trafficker displayed **each** of these red flags at **each** Defendants' properties.

67. Under the Room Next Door training protocol, employees are instructed to alert management, the G6 hotline, and the National Human Trafficking Hotline if they suspected trafficking *or* prostitution.

68. At all relevant times, G6 required the employees at the Motel 6 Claremont to be trained to recognize several behaviors exhibited by Caroline and her trafficker as red flags of sex trafficking and instructed them to report such suspected instances of trafficking.

69. In 2017, California Assembly Bill No. 260 amended Section 52.6 of the Civil Code to require hotels, motels, and bed and breakfast inns to post a notice with information related to human trafficking on their properties.

70. In 2018, under Senate Bill 970 California required Defendants to provide 20 minutes of human trafficking awareness training to all employees who are "likely to interact or come into contact with victims of human trafficking." The bill required employers to give the training by January 1, 2020; to each new employee within six months of their employment in a qualifying role; and then every two years thereafter. The training must include:

a. Definitions of "Human Trafficking" and "Commercial Sexual Exploitation of Children" (CSEC);

b. How to identify individuals most at-risk for human trafficking;

c. The difference between sex trafficking and labor trafficking in the hotel sector;

d. How to report and respond to suspected human trafficking; and

e. The contact information of appropriate agencies, including the National Trafficking Hotline toll-free number ((888) 373-7888) and text number (233733), as well as local law enforcement.

71. The Bill states that the required human trafficking awareness training and education can include the Blue Campaign of the federal Department of Homeland Security.

72. The Department of Homeland Security released the Blue Campaign Hospitality Toolkit in 2018. The Toolkit trains hospitality employees to recognize the following red flags as potential indicators of human trafficking:

a. Individuals show signs of physical abuse, restraint, and/or confinement.

b. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.

c. Individuals have few or no personal items—such as no luggage or other bags.

d. Individuals appear to be with a significantly older "boyfriend" or in the company of older males.

e. A group of girls appears to be traveling with an older female or male.

f. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

g. Excessive amounts of sex paraphernalia in rooms

h. Individuals loitering in hallways or appearing to monitor the area.

i. Provocative clothing and shoes.

j. Constant flow of men into a room at all hours.

k. Extended stay with few or no personal possessions.

l. Room paid for with cash or pre-loaded credit card.

m. Excessive use of hotel computers for adult oriented or sexually explicit websites.

n. Individuals dropped off at the hotel or visit repeatedly over a period of time.

o. Cars in the parking lot regularly parked backward, so the license plate is not visible.

73. Caroline and her trafficker exhibited these industry-recognized indicators of sex trafficking at each Defendant hotel.

74. On information and belief, Defendants provided their employees with anti-trafficking training programs substantially similar to the Blue Campaign's Hospitality Toolkit during the period Caroline was trafficked.

75. On information and belief, each Defendant acknowledged these red flags as signs of sex trafficking, trained their staff to recognize and treat such behaviors displayed by Caroline and her trafficker as signs of sex trafficking when observed in the motel.

76. At all relevant times, each Defendant was required by law to train their employees on how to report and respond to suspected instances of sex trafficking.

77. It is natural to wonder why hotel brands like Motel 6 who boast of their anti-trafficking trainings, act as chairmen on the AHLA board, and donate to survivor funds are simultaneously some of the most common defendants in civil sex trafficking cases.

78. In other words, if hotel employees are equipped to recognize instances of trafficking, why do they continue to rent rooms to suspected traffickers and trafficking victims?

79. One study has identified the barriers to implementing an "anti-trafficking culture" in the hotel sector: prioritizing occupancy and profits over safety, maintaining a customer-service culture that discourages intervention, reliance on a franchise model that dilutes accountability, and weak operational practices that fail to systemically analyze guest data for known indicators of trafficking.[17]

80. Chain hotels' trafficking trainings operate on the level of appearance only. They address the reputational risks to the business but do nothing to address safety concerns or make employees more likely to actually intervene.

81. Sex trafficking is a problem that could not exist—not on anything like the same scale, at least—absent the willing cooperation of the hospitality industry, in whose rooms the great majority of the victims' suffering occurs.

82. Despite clear notice of these risks, Defendants failed to implement and enforce effective anti-trafficking policies, adequate anti-trafficking training programs, and mandatory reporting mechanisms.

83. In addition to a lack of adequate training, Defendants have also failed to convey to employees that the benefits of reporting known or suspected instances of human trafficking outweigh the personal and professional risks of doing so. If employees perceive that reporting trafficking will harm their job prospects, create extra work, or cost the hotel money, they will be deterred from doing so.

84. In practice, this "culture of complicity" allowed Caroline's trafficker to continue exploiting her—while Defendants continued to profit from the room rentals and related revenue.

---

[17] Paraskevas, Alexandros & Brookes, Maureen. (2018). Human trafficking in hotels: an 'invisible' threat for a vulnerable industry. *International Journal of Contemporary Hospitality Management*. 30. 00-00. 10.1108/IJCHM-04-2017-0213

85. This action follows.

## BACKGROUND

### CAROLINE MEETS HER TRAFFICKER

86. Caroline is the daughter of Cuban immigrants and was raised in a two-parent household in Florida.

87. Although Caroline had a supportive upbringing, her parents heavily sheltered her from the dangers of the real world. She was rarely allowed to go out or visit her friends' homes.

88. However, her life changed when she met Devon[18] on a dating app sometime between 2018 and 2019.

89. At the time, Caroline was only 20 years old, and Devon was seven years her senior. Over the following months, Devon skillfully gained her trust and led her to believe that they were in a committed romantic relationship.

90. Initially, Devon was a dream boyfriend; he took Caroline to get her hair and nails done, met her parents, and proposed a trip to California, knowing that she had always wanted to go. Due to Caroline's youth and trusting nature, she never questioned his intentions, nor how he earned the money to spoil her.

91. That dream became a nightmare when Devon arranged for one of his friends to rape Caroline in a hotel room in exchange for payment. Romance turned into horror as Devon told Caroline that, going forward, she would be forced to have sex to make him money—and he threatened the safety of her family if she refused.

92. Devon also threatened to post explicit pictures of Caroline online—taken without her knowledge or consent—and send them to her family.

93. Caroline soon realized that Devon's earlier interest in her family and personal life had been a calculated effort to gain leverage over her. He had fabricated intimacy in order to manipulate and control her.

---

[18] Devon is a fictitious name. This person's real name is known. It is not used herein because Plaintiff fears retribution and because naming him as a party would be futile.

94. This behavior is typical for a "Romeo pimp", who feigns love and affection to create an attachment later used to exploit their victims and entrap them.

95. After the initial assault, Devon's abuse quickly escalated. He became physically violent, grabbing, shoving, slapping, and punching Caroline while forcing her to engage in commercial sex acts.

96. Devon's abuse was extreme. He even put Caroline in the trunk of his car, held her face underwater, and physically forced drugs into her mouth.

97. Devon imposed a $1,000 daily quota and left Caroline on the street to solicit buyers all day without food or water. If Caroline failed to meet her quota, he beat her or withheld food and shelter for the night.

98. As a result, Caroline often worked 16 hours a day to keep Devon happy and herself out of harm's way.

99. Caroline was raped repeatedly by buyers during this period. Rather than comfort her, Devon shamed Caroline for "allowing" it to happen and beat her for failing to collect full payment from the john that raped her.

100. On one occasion, a john kidnapped Caroline and slashed her foot when she jumped out of his moving car. Devon got angry at Caroline and hit her for leaving her purse and phone in the kidnapper's car while she tried to escape.

101. For the next two years, Devon trafficked Caroline in hotels across the country, including in Florida, Texas, Nevada, and California.

102. Throughout this period, Devon took all of Caroline's earnings and confiscated her identification documents—making it impossible for Caroline to escape

103. Caroline's health deteriorated from the long hours, trauma, and lack of food. Caroline lost 45 pounds, becoming gaunt and skeletal, within a matter of months from being trafficked by Devon.

104. Devon constantly monitored Caroline's phone and communications, making it nearly impossible for her to seek help.

105. Caroline lived in constant fear of her trafficker. He repeatedly reminded her that his associates were dangerous and would harm her or her family if she attempted to leave.

106. By the time Devon brought Caroline to California, she was terrified. She had been deceived by the man she believed to be her boyfriend, was a thousand miles away from home, and had no one to turn to for help.

107. Caroline blamed herself for her own naivety and was too scared and ashamed to ask her parents for help.

108. Devon further eroded Caroline's sense of self-worth by convincing her that he was the only reason anyone valued her and the only reason her life was worth anything.

109. To reinforce his ownership and control over her, Devon branded Caroline with a tattoo of his name on her back behind her right shoulder and a moneybag on her finger.

110. Branding is a common indicator of trafficking[19] and often includes tattoos of the trafficker's name and motifs of wealth like moneybags and crowns.[20]

111. In addition to keeping Caroline under surveillance, Devon controlled her further by physically abusing her, withholding important documents, and leveraging her inexperience with the cities where he forced her to work to prevent her from seeking help.

112. Caroline's bank records reflect the extent of Devon's control.

113. During the trafficking period, nearly every cash deposit into Caroline's account—almost certainly from payment for forced sexual services with johns at hotels—was immediately transferred to Devon.

114. Devon would then send just enough of this money back for her to book hotel rooms, pay her phone bill, and eat.

115. For example, on December 20, 2020, Devon sent Caroline $30 for food. After she spent $18 at a convenience store, she promptly returned the remaining $12 to him.

---

[19] "Pimps and traffickers tattoo their victims as a way to psychologically control them and create a permanent mark of ownership… Traffickers also use tattoos to let other pimps know to whom the girls belong." Marianna Ernst, *Marked for the Trade: How Tattoos Are Being Used in Human Trafficking Today*, IOFA Talk: July 2012 (July 31, 2012), https://iofa-talk.blogspot.com/2012/07/.

[20] Shelley Fang et al., *Tattoo Recognition in Screening for Victims of Human Trafficking*, 206 J. Nerv. Ment. Dis. 824, 825–26 (2018).

116. At times, Caroline transferred back as little as $0.99 in change.

117. This is just a glimpse into the extent of financial control Devon had over Caroline.

ESCAPE AND ONGOING SUFFERING

118. Despite Devon's watchful eye, Caroline attempted to escape on at least one occasion.

119. One night, a john held Caroline at gunpoint, raped her, and stole the cash in her purse. Devon's rection to this terrifying and traumatic experience was anger because it meant that Caroline had no cash to give him.

120. The next day, Caroline misled Devon into believing that she was having sex with a john, then ordered an Uber to the airport. Devon was still withholding her identification, but Caroline hoped that someone at the airport would be able to help her find a way to safety.

121. But Devon intercepted Caroline as she waited for her Uber.

122. He asked what she was doing and reminded her that he was the boss and that he hadn't told her she could quit for the day.

123. Devon searched Caroline and found the money that she had hidden under her wig. He decided that forcing Caroline to work the streets for 17 hours straight would be a suitable punishment. Even when she tried, she couldn't leave.

124. In 2021, Devon began beating Caroline more frequently. Her health continued to deteriorate. And she had been raped, robbed, and threatened by johns several times at this point.

125. Despite the repeated violence and retaliation, Caroline continued searching for a way to leave.

126. Eventually, Caroline encountered someone who offered her a path to safety.

127. Tom was a kind and sympathetic stranger that Caroline could confide in.[21]

128. In the summer of 2021, an emboldened Caroline told Devon that she was leaving while they were at his home in Las Vegas.

---

[21] Tom is a fictitious name. This person's real name is known. It is not used herein both to protect his privacy and because he, like Plaintiff, fears retribution from Plaintiff's trafficker.

129. Devon flew into a rage and chased Caroline around the apartment. Eventually, she managed to escape and hide in an alcove of the building.

130. There, Caroline called Tom and asked him to pick her up.

131. He took Caroline back to California and allowed her to stay at his house until she could get back on her feet.

132. With Caroline's newfound freedom, she was able to get a job to support herself.

133. As Caroline's life stabilized, she and Tom developed a relationship and eventually got married.

134. Caroline hopes to become a nurse and is a foster parent for underprivileged and high-needs children, but her ongoing trauma and physical limitations continue to affect her.

135. Despite her escape from "the Life", Caroline still suffers from the psychological, physical, and financial burdens of being a human trafficking survivor.

136. She has undergone extensive therapy for two years through the CalVCB program.[22]

137. She still struggles with anxiety and post-traumatic stress disorder as a result of her trafficking. She often avoids places that remind her of her trafficker and trafficking.

138. Caroline has had to relive her trauma in order to get her record expunged for charges related to her trafficking and in her effort to hold those who profited from her trafficking accountable.

139. More recently, Caroline has lived in fear of her trafficker, who has tried to contact her following his release from prison.

140. Caroline also has lasting physical complications and injuries from her trafficking.

141. During her trafficking, Caroline had surgery on her Achilles that was torn during a frightening encounter with a john who kidnapped her. Her trafficker refused to let her finish physical therapy for her heel.

[22] The California Victim Compensation Board ("CalVCB") is a state-administered program that provides financial compensation to victims of violent crimes, including human trafficking, covering expenses such as medical and mental health care, relocation, and income loss, as authorized by Cal. Gov't Code §§ 13950–13966.

142. Caroline cannot stand for extended periods, has limited range of motion, suffers nerve-related circulation problems, and experiences chronic pain that worsens when the weather changes.

143. Caroline also has permanent scars and scrapes on her legs and her shoulders from jumping out of a moving car during a dangerous interaction with a john.

144. These injuries are a direct result of her trafficker putting her in harm's way.

145. Additionally, Caroline has undergone the physical and financial cost of removing the tattoos her trafficker branded her with.

146. She will also struggle with the financial burden of continuing therapy.

147. Caroline will likely suffer from the psychological, physical, and financial effects of being trafficked for the rest of her life.

## CAROLINE'S TRAFFICKING IN CALIFORNIA

### OVERVIEW (2019 – 2021)

148. From 2019 through 2021, Devon trafficked Caroline for several months out of motels in California.

149. On her first night, Devon left Caroline on a dark street in Hollywood to pick up buyers. Already frightened and disoriented, she grew anxious when the police approached her. They asked whether she was with anyone or if someone was waiting for her, and Caroline admitted that she was with someone.

150. The officers placed Caroline in their patrol car and drove around the area searching for Devon, but they were unable to find him. Eventually, they released her. Devon, however, had seen Caroline sitting in the back of the police car. When he confronted her afterward, he berated her for speaking to law enforcement.

151. Devon told Caroline that if she were ever stopped by police again, she was to say she was alone. To ensure that his message stuck, he punched her in the face.

152. From that moment forward, Caroline understood that she was not permitted to speak to law enforcement without Devon's approval and that he was constantly watching her.

153. In addition to street-based prostitution, Devon expanded his trafficking operation in California to include hotel-based "in-calls."

154. An "in-call" is when a customer comes to a sex worker's location—usually a hotel room—for commercial sex.

155. For these in-calls, Devon routinely rented rooms by the day. He did this to make it clear that if she failed to meet her $1,000 quota, Caroline would have nowhere to sleep.

156. To supplement these in-calls, Devon also forced Caroline to walk the "track" on Figueroa Street in Gardena and Holt Avenue in Claremont—both notorious hotspots for trafficking—to find johns to bring back to the motels.[23]

157. While Caroline walked these tracks, Devon constantly monitored her by driving up and down the street or parking his car nearby.

158. Devon also advertised Caroline for sex online. After responding to Devon's ads, these buyers came to Caroline's motel room and paid for commercial sex.

159. In California, Caroline most often did these in-calls out of the following motels, all located just off the track: the Moonlight Inn, the Sunset Inn, the Gardena Towers Inn, and the Motel 6 Claremont.

160. In addition to their proximity to Figueroa Street, the Moonlight Inn, the Sunset Inn, and the Gardena Towers are all located on Western Avenue. According to residents, law enforcement, and L.A. City Attorney Feldstein Stoto,"[h]uman trafficking has long been a problem on Western Avenue."[24]

161. The Motel 6 Claremont is located directly along Claremont's own track between Indian Hill Boulevard and the I-10 Freeway—an area referred to as an "open-air sex market."[25]

---

[23] A track is a synonym for "blade," which is "a street where hoes work." PIMPIN' KEN & KAREN HUNTER, PIMPOLOGY: THE 48 LAWS OF THE GAME 178 (2008).

[24] Iman Palm, *L.A. City, County Leaders Teaming Up to Target Sex Trafficking Along Western Avenue*, KTLA (Jan. 27, 2026), https://ktla.com/news/local-news/l-a-city-county-leaders-teaming-up-to-target-sex-trafficking-along-western-avenue/

[25] Robert J. Bunker & Mae Key-Ketter, *Prostitution in South Claremont I-10 Freeway Corridor: A Preliminary Assessment* (C/O Futures Illicit Economy Research Note Series, July 29, 2022), https://www.claremontca.gov/files/assets/public/v/1/community-development/documents/hotelmotel/final-attachment-b-public.pdf

The Claremont Police Department has "received multiple complaints from residents, business owners, and [passersby] regarding prostitution" in the area.[26]

162. The widespread nature of commercial sex activity surrounding the Motel 6 Claremont was well known within the community. At the City's May 16, 2022 Human Trafficking Symposium, residents "overwhelmingly responded to a growing cancer that must be eradicated at the South Claremont corridor of the I-10 Freeway and Indian Hill Boulevard: the out of control sex trafficking, prostitution, criminal behavior, and drug use and dealing at the Knights Inn, Motel 6 and Claremont Lodge." Residents further described the area as "the biggest eyesore in the City of Claremont" that threatened public safety.[27]

163. Reflecting these longstanding conditions, the City of Claremont enacted Ordinance No. 2023-01, finding that "for at least a decade" motels located near the interstate had experienced "severe and pervasive criminal activity," including "prostitution, human trafficking, narcotic sales, gang activity, and violent crimes against persons," and that such criminal activity had become significantly worse in recent years.[28]

MODUS OPERANDI AT CALIFORNIA MOTELS

164. At each Defendant motel, Devon operated in a substantially similar manner, using the same methods of coercion, room rentals, advertising, and customer traffic to exploit Caroline for commercial sex.

165. Devon had a routine for Caroline to follow at each California motel where he trafficked her. On each occasion when she stayed at Defendants' locations, Caroline:

a. stayed in rooms rented by Devon under his name; or occasionally rented rooms under her real name;

b. requested extra linens or towels daily;

---

[26] Cameron Kiszla, *11 Arrested, Including Alleged Pimp, in Claremont Prostitution Sting*, KTLA 5 News (June 17, 2024), https://ktla.com/news/local-news/11-arrested-including-alleged-pimp-in-claremont-prostitution-sting/ (last visited July 22, 2026)

[27] Ginger Elliot, Sonja Stump, Jim Keith & Al Villanueva, *Viewpoint: Taking Back the Streets of South Claremont*, Claremont COURIER (May 26, 2022), https://claremont-courier.com/latest-news/viewpoint-taking-back-the-streets-of-south-claremont-65922/

[28] City of Claremont, Cal., Ordinance No. 2023-01, *An Ordinance of the City Council of the City of Claremont, California, Adopting Amendments to Title 16 of the Claremont Municipal Code* (Mar. 28, 2023), https://www.claremontca.gov/files/assets/public/v/1/community-development/documents/hotelmotel/09-annual-hotel_motel-ordi.pdf

c. left several used condoms in the motel trashcan every day;

d. constantly had a "Do Not Disturb" sign on her motel room door;

e. had multiple, unregistered male guests to her room for short periods of time each day, including in broad daylight;

f. moved about in public areas of the motel while clearly dressed for sex work;

g. never brought a suitcase for long stays and had few personal possessions;

h. wore and re-wore clothes consistent with sex work;

i. mainly paid for and renewed rooms in cash (or reserved on Priceline and renewed with cash);

j. extended stays day by day or booked for a week at a time;

k. often stayed for weeks at a time;

l. displayed visible bruises, injuries, and a branding from her trafficker;

m. appeared tired, malnourished, and disoriented.

166. At each of these locations, Caroline performed numerous in-calls per day. Each day that Caroline stayed at one of these hotels, there was a regular flow of men in and out of her room.

167. These johns either had to walk through the motel lobby, past the front office, or in direct sight of security cameras.

168. It was common for johns, some being repeat customers, to come to Caroline's room for commercial sex during the day while hotel office staff and cleaning personnel were on duty.

169. Hotel staff were thus able to see Caroline open the door for multiple strange men a day while dressed in revealing outfits.

170. At other "nicer" hotel locations, Devon instructed Caroline to cover up so that her attire would not show her injuries or tip staff off to her trafficking. But at Defendants' properties, Devon felt so comfortable that he told Caroline to not bother with hiding her injuries, attire, or activities.

171. At Defendants' motels, Caroline often wore bikini tops, lace, fishnets, see-through clothing, nipple stickers, and stripper heels.

172. She even stuck condoms in the holes of her fishnets.

173. She wore this attire while she walked through the motels, renewed room reservations, and walked out to Devon's car in the parking lot to hand over the money she made for the day.

174. Not only did her clothing make it hard for staff to ignore the nature of her work, but it also made the bruises and injuries her trafficker frequently gave her visible.

175. Caroline's clothing made the tattoos her trafficker branded her with, including a tattoo of his name, easily visible when she moved about Defendants' motels.

176. In short, staff at each Defendants' properties repeatedly witnessed and interacted with Caroline while she was barely clothed, visibly injured, and branded.

177. Devon engaged in a consistent pattern while trafficking Caroline. On multiple occasions at each Defendant motel, except for Gardena Towers Inn, Devon:

a. Paid for rooms in cash using his real I.D.;

b. stayed overnight in the same room as Caroline when she was done with in-calls for the day;

c. physically and verbally abused Caroline to coerce and force her into commercial sex acts;

d. interacted with motel staff;

e. moved about in public areas of the motel visible to security cameras;

f. parked his car backwards or in a particular manner in the motel parking lot so as to hide his license plate from security cameras;

g. advertised Caroline for sex online and arranged dates for her while on motel property;

h. loitered in the motel parking lot or in public areas of the motel while Caroline was engaging in commercial sex acts in their room;

i. monitored Caroline's and johns' movements in and out of the hotel room;

j. received money from Caroline immediately after dates in areas of the motel property covered by security cameras, or else entered their hotel room immediately after a john left their room.

178. Upon information and belief, Devon used motel provided Wi-Fi to post on and access websites where he advertised Caroline for sex.

179. Each motel had ample opportunity, and training, to flag Caroline as a human trafficking victim and Devon as her trafficker.

180. Instead, they ignored the signs and continued renting rooms for Caroline to be trafficked in.

181. The following sections describe, motel by motel, how Devon carried out this trafficking scheme on Defendants' properties.

A MOONLIT NIGHTMARE

182. Devon chose to traffic Caroline out of the Moonlight Inn in Gardena, California for its proximity to Figueroa Street and its reputation as a spot where pimps could book rooms and sell women for commercial sex without interference.

183. During the trafficking period, Caroline observed other girls being sold for sex at the Moonlight Inn, sex buyers coming and going from rooms, and abusive pimps in the parking lot on a daily basis.

184. During one of her stays, Caroline saw a pimp chase a woman through the Moonlight parking lot and head-butt her. The pimp was enraged because he caught the woman keeping some money for herself—a cardinal sin in "the Life". The assault was so violent that the pimp lost a tooth.

185. Upon information and belief, staff at the Moonlight Inn were aware of this incident and of the routine physical abuse and commercial sex exploitation occurring on the property.

186. From 2019 to 2021, Devon trafficked Caroline out of the Moonlight Inn across at least five separate stays. Upon information and belief, the majority of these stays were in 2019.

187. Devon and Caroline stayed at the Moonlight Inn for extended periods—often for more than a week at a time, and for nearly two months on one occasion. The length of each stay depended on how profitable the location was for her trafficker.

188. Devon had previously trafficked other girls at the Moonlight Inn without issue and had developed familiarity with at least one staff member. Upon information and belief, this staff member knew Devon had abused and sold other women for sex at the property.

189. When Devon brought Caroline to the Moonlight Inn, this employee recognized Devon and greeted him warmly.

190. Because of his prior history and rapport with the staff, Devon felt comfortable trafficking Caroline at the Moonlight Inn and did not try to be discreet.

191. When Devon paid for the room, he often let the Moonlight front desk employee keep the change, making comments like, "Don't worry about it; you know me," and "You know I appreciate things like that."

192. Upon information and belief, "things like that" referred to the Moonlight Inn renting him rooms to use for sex trafficking, including preferential room placement near the front office to reduce exposure to other guests and minimize the risk of interference by law enforcement.

193. This employee often saw Devon and Caroline together and interacted with them during their stays. Upon information and belief, this employee knew Devon was abusing Caroline and compelling her to sell sex.

194. Other Moonlight employees also saw Devon and Caroline together on the property on multiple occasions. Devon and Caroline stayed in the same room, came and left from the same room, came and left in the same car, and often entered and exited both the room and the motel together.

195. Devon wanted Caroline to get familiar with the staff, so he sometimes sent her to the front desk to extend their stays in cash with the money she earned that day from prostitution.

196. During these interactions, Caroline often looked exhausted and disoriented because Devon forced her to take pills so she could endure long shifts with sex buyers.

197. Over time, the front desk employee even stopped asking them to show their IDs at check-in or when extending their stay.

198. Devon and Caroline always paid for the rooms in cash. When they tried to pay by other means, the front desk employee demanded cash-only payment. He voiced this preference to Caroline at least once when she rented a room, telling her that he knew she would have cash.

199. Upon information and belief, this statement reflected his awareness that Caroline was engaging in commercial sex, which he knew from experience working there was typically a cash business.

200. At the Moonlight Inn, Devon and Caroline operated under the same modus operandi described in paragraphs 164–181 *supra*.

201. While staying at the Moonlight Inn, Caroline typically had sex with two to three johns per day.

202. These johns arrived at the room throughout the day while motel staff were on duty. They walked through the interior of the motel—directly past the front desk—to reach Caroline's room and to exit the motel only a short time later.

203. This pattern of unregistered male guests coming and going from a room booked for Caroline and her trafficker happened over a hundred times during the relevant period at the Moonlight Inn.

204. After Caroline met her quota by engaging in commercial sex at the motel, Devon stayed overnight with her at the Moonlight.

205. At the Moonlight, Caroline and Devon requested new towels and sheets for the room every day. And the trash in their room—filled with several used condoms—was changed nearly every day.

206. Caroline either went to the front desk or waited for the cleaning lady to pass by the room to request these housekeeping services.

207. Moonlight Inn staff witnessed this pattern of conduct on numerous occasions. While such behavior is indicative of commercial sex, it is also widely recognized in the hospitality industry as a hallmark of sex trafficking when accompanied by indicators of control, coercion, and abuse.

208. Moonlight staff were trained to recognize these indicators—including repeated male traffic, cash payments, extended stays, visible injuries, discarded condoms, frequent linen requests, controlling companions, and signs of fatigue or disorientation—as red flags of trafficking rather than isolated or consensual activity.

209. In addition to these patterns, Moonlight staff had further opportunities to observe signs of coercion and abuse.

210. Upon information and belief, the front desk employee either lived on the property or often stayed overnight in a room attached to the front office.

211. Caroline and Devon were often assigned rooms by this front office.

212. Devon fought with Caroline in these rooms on several occasions. Devon threw Caroline off the bed, shoved her into furniture, punched her, and yelled at her for not making enough money.

213. On one occasion, Devon brutally beat Caroline in a room near the front office after she was robbed on Figueroa Street. She pleaded with him to stop and tried to scream, while he tried to cover her mouth.

214. Upon information and belief, Moonlight Inn staff heard these fights and Caroline's cries for help.

215. Moonlight Inn staff continued to rent rooms to Devon and Caroline after these incidents and continued to observe Caroline—now with fresh injuries—engaging in the same commercial sex activity.

216. Taken together, Devon's established relationship with staff, his repeated presence with Caroline, the volume of commercial sex occurring in their room, Caroline's visible injuries and impaired condition, and the pattern of coercive and violent conduct on the property are not indicative of independent or consensual activity, but of trafficking controlled by a third-party exploiter.

217. Based on these facts, Moonlight Inn staff knew—or, at minimum, recklessly disregarded—that Devon was using coercion and abuse to force Caroline to engage in commercial sex at the property.

218. Despite these red flags, Devon and Caroline were never asked to leave the property or denied rooms.

219. The pervasive and open nature of this conduct was not unique to Caroline's trafficking, but instead reflected a broader, ongoing pattern of exploitation at the Moonlight Inn that was visible to staff and other guests.

220. There is a pending human trafficking case against the Moonlight Inn and the Sunset Inn for a girl that was trafficked during the same time period as Caroline. *See, e.g.*, *Jane Doe v. H&R Hospitality LLC*, *et al.,* No. 24TRCV03370 (Cal. Super. Ct., Los Angeles Cnty. 2024).

221. On information and belief, all allegations contained in the complaint of the aforementioned case are true and correct unless directly contradicted by the allegations herein.

222. A 2021 Google review of the Moonlight Inn demonstrates the motel's awareness of illegal activities occurring on the premises during the trafficking period. One guest awarded five out of five stars but stated that "It's a very sneaky hotel in the man doesn't want to call the cops cuz he don't want any problems what kind of owner does that."

223. A recent review from May 2025 noted the continued prevalence of prostitution near the Moonlight. This guest awarded two out of five stars, stating that there were "hookers and other fun activities" located near the Moonlight Inn. While this review was not left concurrently with Caroline's trafficking, they demonstrate that evidence of sex work remains visible to other guests.

224. By repeatedly renting rooms to Devon and Caroline despite clear indicators that Caroline was engaged in commercial sex; by ignoring visible signs of coercion and abuse—including bruises, branding, drug use, malnourishment, and violent altercations; and by accepting cash payments generated from that activity while facilitating their stays, the Moonlight Inn and its staff knowingly benefited from and participated in Devon's trafficking venture.

## SOLD FOR SEX AT THE SUNSET INN

225. Devon trafficked Caroline at the Sunset Inn in Gardena, California, across approximately 10 to 13 different stays from 2019 to 2021.

226. These stays ranged from a few days to several weeks. Upon information and belief, the majority of these stays were during the COVID-19 pandemic in 2020, when they stayed at the Sunset Inn for a month straight.

227. Devon chose to traffic Caroline at the Sunset Inn because, like the Moonlight, it was a known location for pimps to bring women for commercial sex with little to no interference from staff and because of its location near the track.

228. The Sunset Inn shared a parking lot with the Moonlight Inn, so their staff members were able to—and did—witness the same fights between pimps and their prostitutes that Moonlight Inn staff witnessed.

229. Caroline recalls multiple incidents where pimps beat up the women they were controlling in the parking lot outside of the Sunset Inn.

230. On one occasion, Caroline witnessed a pimp become violent toward another victim. He beat her in their room, in the hallway, while she tried to get away down the stairs, and continued beating her the parking lot—in view of Sunset Inn staff. Despite the commotion, motel staff did not intervene, call the police, or kick the pair out.

231. Upon reference, the Sunset Inn and the Moonlight Inn had the same property owners.

232. Upon information and belief, the Sunset Inn and the Moonlight Inn shared staff, including staff who witnessed Caroline's trafficking at both locations.

233. At the Sunset Inn, Devon and Caroline operated under the same modus operandi described for the similarly operated Moonlight Inn.

234. For example, Caroline and Devon extended their stays nearly every day in cash.

235. Staff often came directly to their door to collect cash to renew the rooms and charged them $10 more for this service. Either Devon or Caroline paid the fee while the other one, and another younger victim, were present in the room.

236. Staff at the Sunset Inn took note of who Caroline associated with, and they noticed that Devon and Caroline always arrived and moved as a pair.

237. For example, motel staff sometimes asked Caroline if she or "the guy" she was with would be paying. On information and belief, motel staff were referring to Devon when they said "the guy."

238. At the Sunset Inn, Devon also trafficked another girl with Caroline. Motel staff asked Caroline if this girl was her friend and said they looked alike.

239. When Caroline and Devon stayed for longer than one week, Sunset staff instructed them to check out and then immediately check back in. This was an administrative formality. They never even changed rooms or left the motel.

240. At the Sunset Inn, Carolie was forced to have commercial sex with four to five johns per day.

241. During these dates, Devon usually waited in his car in the motel's parking lot. And he was not the only one. Caroline saw other women staying at the Sunset Inn with their pimps every night.

242. Multiple nights a week, their pimps waited in the parking lot while the women they controlled had commercial sex in the Sunset Inn motel rooms.

243. These pimps—including Devon—socialized, played music, drank alcohol, and dealt drugs in the parking lot while they monitored the women they were selling for sex as they did dates in the rooms. Staff observed Devon and these pimps in the parking lot. Sunset Inn staff were well aware of these activities given how openly and repeatedly they occurred.

244. After dates, Caroline came to Devon's car in the parking lot—wearing clothes consistent with sex work—to hand over her earnings to him.

245. On information and belief, all of these parking lot interactions were visible on security cameras.

246. Similar to the Moonlight Inn, Caroline had to ask housekeeping staff at the Sunset Inn for new linens and towels each day and to change her trash.

247. Frequent linen requests and condoms in the trashcan are signs of prostitution and red flags of trafficking.

248. In addition to the frequent linen requests and condoms in the trash can, much more of Caroline and Devon's behavior should have clued in the Sunset Inn's staff to Caroline's trafficking.

249. On one occasion, a sex buyer was trying to force Caroline to do something she didn't want to do in the Sunset Inn room. She called Devon, who was waiting in the parking lot. He came up to the room and chased the john out of the room and down the stairs without his clothes on.

250. On information and belief, Sunset staff either observed this incident directly or saw it on security footage.

251. Because of their knowledge of Caroline's commercial sex work, the front desk staff charged Caroline a higher rate than other patrons when she checked in, making comments like "For you, $__ a night/week."

252. Next, we turn to the story told by public-facing guest reviews of the Sunset Inn found on Google.

253. Relevant reviews of the Sunset Inn include:

a. One guest awarded two out of five stars and said, "Pimps and prostitutes and the continuous aroma of THC."

b. Another guest awarded one out of five stars and said, "Absolutely under no circumstances bring kids to this hotel. Unless you want to educate them very quickly."

c. Another guest awarded one out of five stars and said, "Lots of "working women" and their **"**bosses**"** lots of people in and out."

254. These reviews were left before or during Caroline's trafficking period. The reviews demonstrate that evidence of sex work involving pimps was visible to guests.

255. The Sunset Inn had reason to suspect that Caroline was a trafficking victim — it recognized her commercial sex work, maintained ties with her trafficker, and observed Devon's control over her and her money — yet continued renting rooms in a manner that lined its own pockets.

<u>TRAFFICKED AT THE TOWERS</u>

256. Caroline was sold for sex at the Gardena Towers Inn across three to five stays between 2019 and 2021.

257. Upon information and belief, Caroline was trafficked at the Gardena Towers for approximately 3 weeks straight in the fall of 2020.

258. At the time, Caroline had a serious foot injury.

259. She had been kidnapped by a john in his car. Caroline jumped out of the moving car to escape, but as she did the john threw a sharp object at her leg. It cut through her Achilles heel and required surgery and extensive physical therapy.

260. During this time period, Devon set up his home base in Las Vegas. He sent Caroline to work in Los Angeles while she recovered from her injury.

261. Devon initially instructed Caroline to go to the Moonlight Inn. When she got there, an employee told her that the front desk employee who was familiar with her and her trafficker now worked at the Gardena Towers Inn.

262. Knowing that that particular man was indifferent to her trafficking, Caroline made her way to the Gardena Towers Inn. She knew that there, he would permit her to have commercial sex in the motel rooms without intervention.

263. Indeed, this man recognized Caroline when she arrived at the Gardena Towers Inn.

264. He asked her where her trafficker was, and Caroline told him he was in Las Vegas and that it would just be her this time. He told her to tell Devon he says, "What's up."

265. He gave Caroline the same rates he did at Moonlight, even though Gardena Towers' rates were higher. He even put her in a room on the first floor near the front desk after noticing she was on a scooter from her leg injury.

266. On information and belief, Gardena Towers Inn hired this particular staff member while knowing how Moonlight Inn (his former employer) operated and particularly while being aware of its permissive attitude toward commercial sex and sex trafficking, and Gardena Towrs Inn encouraged or at least permitted this staff member to bring the same permissive attitude to his employment at Gardena Towers Inn.

267. Caroline was unable to walk the track, so she arranged dates by posting advertisements for sex online from the motel room or by seeing her clients from previous stays in Gardena.

268. On information and belief, Caroline used motel Wi-fi to post her advertisements for sex online.

269. During her stay, Caroline was forced to have commercial sex with six to nine johns per day to meet Devon's quota.

270. Because of her injury, all johns came directly to her room during that time for commercial sex. On information and belief, hotel staff witnessed several men coming in and out of her ground-floor room across short time intervals several times a day—a recognized sign of human trafficking.

271. During her stays at Gardena, Caroline sent all her earnings to Devon, as reflected by her bank records. And he still controlled her access to certain resources. For example, during this period he once sent her $2 for water.

272. Through his extensive control over her resources, threats, and physical and psychological abuse, Devon conditioned Caroline to be obedient. Even though Devon was not physically present, Caroline feared she would face serious harm if she did not comply with his orders at the Gardena Towers.

273. Trafficking victims often engage in what experts describe as conditioned or "automatic" behavior—reflexive compliance shaped by repeated coercion, trauma, and survival adaptation, rather than free or voluntary choice.

274. Gardena Towers Inn staff were familiar with Caroline from her previous stays at Moonlight Inn. By asking her where Devon was upon her arrival, it became clear they knew she was still working for Devon. Although Devon was not present at Gardena, the staff members observed the same signs that Caroline was engaging in commercial sex, this time while seriously injured. In conjunction with the knowledge that she was still working for Devon, the Gardena staff recklessly disregarded that Caroline was still being coerced and profited off her room rentals.

275. On information and belief, before they were scrubbed from the internet, the reviews of the Gardena Towers Inn included numerous testimonials about the high prevalence of pimp-controlled prostitution and Gardena Towers Inn's tolerance thereof.

THE "MOTEL SEX" IN CLAREMONT

276. Devon brought Caroline to the Motel 6 in Claremont when business slowed in Los Angeles. He chose this Motel 6 because it was located near Holt Avenue and Indian Hill Boulevard, known as the local "tracks" in Claremont.

277. The Motel 6 Claremont's reputation for prostitution and trafficking was well-established. In 2020, the Claremont Police Department conducted a prostitution sting on Holt Avenue due to increased activity at the motel. Sergeant David Hardin explained that prostitutes solicit johns along the Motel 6's side streets and then bring them back to their motel rooms.[29]

278. This law enforcement intervention at the Motel 6 Claremont was not an isolated incident. In 2019, Claremont police rescued a 17-year-old girl at the Motel 6 after receiving a tip that she was being trafficked on the property.[30]

279. Consistent with these incidents, Motel 6 Claremont developed a reputation as a "central hub[] for human trafficking" and has even been referred to as the "Motel Sex."[31]

280. As a result of this reputation and a "perceived increase" in human trafficking, the property has become the target of several prostitution and human trafficking sting operations over the years—including at least two during Caroline's trafficking period.[32]

281. The problem was so pervasive that the City of Claremont proposed, and later enacted, a motel ordinance specifically targeting prostitution and human trafficking at three local motels deemed to be the most friendly to traffickers—including the Motel 6 Claremont. The ordinance required motel operators to implement basic anti-trafficking safeguards such as verifying guest identification, maintaining detailed guest registries, restricting short-term or rapid room turnover, installing surveillance cameras in common areas, and making records available to law enforcement.[33]

---

[29] Mick Rhodes, *Prostitution Sting Nets Arrests in Claremont and Pomona*, Claremont Courier (Sept. 24, 2020), https://claremont-courier.com/latest-news/t38992-28448/

[30] *See* Crime, *Claremont Courier* (Jan. 17, 2019), https://claremont-courier.com/latest-news/t30661crime-30916/

[31] Lorenzo Cano, *An Investigation into Prostitution in Claremont*, The Wolfpacket (Sept. 30, 2022), https://thewolfpacket.org/8991/news/an-investigation-into-prostitution-in-claremont/

[32] Barbara Reilley, Four Special Enforcements and a Prostitution Sting Nets 49 Arrests, *Crime Voice* (Sept. 29, 2020), https://www.crimevoice.com/2020/09/29/sting-nets-49/;

[33] Mick Rhodes, *Proposed Ordinance Puts Crime Onus on Motels*, Claremont Courier (Apr. 14, 2022), Proposed ordinance puts crime onus on motels | Claremont COURIER/

282. On information and belief, Defendants G6 and Bhuvneshwari were aware of both these law enforcement actions and the Motel 6 Claremont's reputation as a hotspot for prostitution and human trafficking before and during the time period Caroline was trafficked there.

283. This reputation made the Motel 6 Claremont attractive to Devon and other traffickers. Devon had previously trafficked other women at this location without interference from staff, and the property was profitable for his trafficking operation.

284. Caroline's own experience at the Motel 6 Claremont mirrored the property's reputation and Devon's prior trafficking ventures.

285. During each stay, Caroline saw at least one other pimp-prostitute pair operating out of the motel. Other pimps and prostitutes were present in the parking lot at all hours of the day and night.

286. Between 2019 and 2021, Caroline was trafficked at the Motel 6 Claremont across approximately ten separate stays. These stays ranged from a few days to as long as two weeks.

287. In particular, Devon trafficked Caroline at the Motel 6 Claremont in the summer of 2020 and during the last six months of her trafficking with at least one stay in February of 2021 and at least one stay in May of 2021. On information and belief, Devon trafficked Caroline at the Motel 6 Claremont on additional occasions throughout the relevant time period.

288. After Caroline suffered a leg injury, Devon recruited another girl to sell for sex alongside Caroline. Although Devon claimed the girl was 19 years old, Caroline suspects she might have been underage because she looked so young. Devon also beat and left bruises on her, just as he did to Caroline.

289. During the last six months of her trafficking, Devon began doing more drugs and became particularly violent toward Caroline. She recalls her time at the Motel 6 Claremont as one of the most abusive periods with Devon and where signs of trafficking were the most obvious to staff.

290. During each stay, Caroline was forced to engage in commercial sex with five to six johns per day. Over the course of longer stays, this resulted in dozens of male visitors entering and exiting her room.

291. In total, Devon forced Caroline to have commercial sex at least 100 times at the Motel 6 Claremont.

292. Here, Devon and Caroline operated under the same modus operandi described in paragraphs 164–181 *supra*.

293. Caroline and Devon often stayed in rooms close to the front desk whose doors were in direct line of sight from the front desk.

294. Shortly before a sex buyer arrived, Devon left the motel room and waited in his car in the parking lot or in other public areas of the motel, sometimes with his dog, which made him even more conspicuous.

295. Then, an unregistered male guest entered the motel room with Caroline and stayed for a short period of time.

296. Shortly after the buyer left, Devon either reentered the room to collect the money, or Caroline went out to Devon's car in the parking lot and handed him the money.

297. Caroline was always clearly dressed for sex work when she handed Devon the money in the parking lot, wearing the attire described in previous sections.

298. This pattern was repeated several times a day during each stay and was witnessed by motel staff either directly or through surveillance footage.

299. Motel 6 staff repeatedly interacted with Devon, observed him on the property—at the front desk, in the parking lot, in the hallways, and on surveillance cameras—and observed his consistent association with Caroline, and the other victim, in connection with rooms exhibiting clear signs of commercial sex activity.

300. Devon's conduct—including booking the rooms, waiting in the parking lot while unregistered male guests came and went, collecting money from Caroline after each encounter, posting sex ads online, and maintaining a continuous presence on the property—demonstrated that he was both controlling and profiting from the commercial sex occurring in those rooms.

301. On information and belief, the Motel 6 staff knew that Devon was Caroline's pimp and was facilitating the commercial sex in their motel rooms.

302. With this knowledge, Motel 6 staff repeadetly rented rooms to Devon and observed two bruised, exhausted women—one of whom appeared underage—enter the room he had just booked.

303. Motel 6 staff never asked Caroline or the younger girl to show their IDs when they stayed in rooms booked by Devon or when they paid to extend a room they were not registered for. Staff only asked for the room number.

304. Staff at the Motel 6 Claremont were nominally trained to recognize the following indicators as red flags of sex trafficking: heavy male foot traffic, revealing clothing, condoms in the trash, short-term bookings with repeated extensions, signs of abuse, individuals monitoring rooms and loitering, and advertisements for sex posted online. Staff at the Motel 6 Claremont observed each one of these indicators in relation to Devon and Caroline.

305. Staff at the Motel 6 Claremont were also required to report suspected instances of trafficking and prostitution to management and Defendant G6.

306. In tandem with these behaviors, staff observed several signs of abuse on Caroline.

307. The Motel 6 staff repeatedly saw Caroline with visible injuries and tattoos indicative of branding by her trafficker at the front desk, in the parking lot, in the hall, and on security cameras. During her interactions with staff, Caroline appeared anxious, disoriented, and malnourished.

308. Motel staff also observed and heard loud arguments and violent altercations between Caroline and Devon.

309. On one occasion, Devon yelled at Caroline about an incident that occurred on the track. He was high and became physically violent inside the motel room.

310. Caroline fled the room into the motel's parking lot in broad daylight, believing Devon would not continue hitting her in public view.

311. But Devon ran after her, beat her near his car, and dragged her back to the room.

312. On information and belief, this incident was caught by security cameras and seen by staff in the front office, as the parking lot was in direct sight of the office.

313. Still, no staff intervened, contacted law enforcement, or removed Devon or Caroline from the premises. Caroline continued to be trafficked at the Motel 6 in the days that followed, now bearing fresh bruises from the assault.

314. On another occasion, Devon beat Caroline inside the motel room. After the assault, he stormed out, leaving the door open while a housekeeper was in the hall outside the room.

315. Right after Devon left, the housekeeper entered the room without a service request.

316. Caroline was sitting on the bed with visible injuries and visibly distressed. The trashcan in the room was filled with used condoms.

317. The housekeeper looked concerned but did not ask Caroline if she needed help. She changed the trash full of condoms and left the room.

318. This incident stuck with Caroline because housekeeping did not typically enter the rooms unless service was requested.

319. Caroline believes that this housekeeper overhead the fight with Devon and came into the room because she was curious about what had happened.

320. Devon continued to traffic Caroline out of the Motel 6 Claremont after this incident.

321. During her stays, Caroline received strange looks from staff. Some staff member even acknowledged her sex work, making comments like, "You about to go get that money, huh?" and "Oh, you look good." During these interactions, Caroline was visibly injured.

322. Staff at the Motel 6 also let Caroline extend rooms in cash even when the room was initially booked on Priceline. Although the policy required the guest to renew on Priceline, a staff member allowed Caroline to renew the room in cash making the comment, "You good. You been here before." During these interactions, Caroline was visibly injured.

323. All told, Motel 6 staff repeatedly accepted payment from, and rented rooms to, Devon and Caroline despite clear indicators that Caroline was engaged in commercial sex on the property and was being controlled and abused by Devon.

324. The trafficking and commercial sex activity described above did not occur in isolation, but reflected a broader, visible pattern at the Motel 6 Claremont.

325. We now turn to the story told by public-facing guest reviews of Motel 6 Claremont.

326. Relevant reviews of Motel 6 Claremont mention obvious pimp-controlled prostitution:

a. In July of 2021, another guest awarded one out of five stars on Yelp and said, "OK first off let me tell you if you are with a family this is NOT the place this place has pimps and prostitutes and DRUG calls.....literally all over the place you get a show if you sit in your car and you watch I had condom wrappers outside my car. . . Clean up the trash literally the trash around the place and the actual trash around the place it looks tacky. #MotelSex #Motelpimp"

b. In December of 2020, another guest awarded one out of five stars on Yelp and said, "This place is dangerous period!!!. . . There's a lot of prostitution, some parties and fights at this location. I was also asked where I was from by a couple gang members here, not to mention the drug attic's lurking around asking for change or foil. I mean who asks for foil at 6am, I know your not trying to bake a cake."

327. Additional reviews following the trafficking period further demonstrate the continued visibility of prostitution and related activity at the motel:

a. In April of 2022, one guest awarded one out of five stars in a TripAdvisor review titled "Bad beyond words," and explained "Floors dirty and sticky, bed linens smelled like a nightclub and prostitutes walk the parking lot at night.....Not safe, not clean, and totally disgusting."

b. In April of 2022, another guest awarded one out of five stars on Yelp and said, "I checked into the hotel in the daylight and the hotel seemed dirty and sketchy. . . Came back at night and saw two nearly naked prostitutes walking near our room, and a room that looked like they lived there. There were parties in cars that spilled into rooms of dangerous looking people."

c. In April of 2022, another guest awarded one out of five stars on Yelp and said, "Absolutely filthy, neglected and dangerous. Prostitutes and sketchy people in the parking lot.... They literally don't care about cleanliness, customer safety. . . It should be condemned by the health dept... GROSS!!!"

328. It is the standard procedure for hotels to check their reviews on third-party websites. As explained below, G6 demanded the right to charge Bhuvneshwari a fee for not addressing negative reviews on these sites. On information and belief, G6 aware of the multiple negative reviews referencing prevalent prostitution—and in most cases pimping (trafficking)—taking place at the Motel 6 Claremont before Caroline was trafficked.

329. Defendants were further aware that Caroline specifically was being trafficked because they repeatedly interacted with her and Devon and observed the exact indicators of trafficking on which they were trained.

## DEFENDANTS' KNOWLEDGE AND ROLE IN CAROLINE'S TRAFFICKING

MOTEL OPERATOR DEFENDANTS

330. The motel properties at issue in this action—the Moonlight Inn, the Sunset Inn, the Gardena Towes, and the Motel 6 Claremont where Caroline was trafficked—are collectively referred to herein as the "Subject Motel Locations."

331. The Defendants that owned, operated, managed or franchised the Subject Motel Locations (the "Motel Operator Defendants"), including H & R Hospitality, LLC; Sunrise Union Investments, LLC; A & J Bhaghat, Inc; Ramesh Chunilal Bhagat; Nimesh Bhaghat, Anjani Management, Inc; and Bhuveshwari Corporation are collectively referred to herein as the "Motel Operator Defendants." The following allegations apply to each Motel Operator Defendant with respect to its respective Subject Motel Location.

332. Knowledge of trafficking red flags obtained by staff at each Subject Motel Location is imputed to the Motel Operator Defendant responsible for that location because such knowledge is relevant to the staff's job responsibilities.

333. Each Motel Operator Defendant therefore knew about the widespread and ongoing trafficking at its respective Subject Motel Location, including the trafficking of Caroline, through the direct observation of red flags by hotel staff, including management-level staff.

334. Each Motel Operator Defendant knew or should have known about the sex trafficking at its respective Subject Motel Location based on: surveillance of the property, internal investigations; customer complaints; monitoring of customer feedback; information received from law enforcement, and other sources of non-public information available to that Motel Operator Defendant.

335. Multiple employees at each Motel Operator Defendant, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment at the applicable Subject Motel Location.

336. As such, each Motel Operator Defendant knew or was willfully blind to the fact that Caroline was being trafficked at its respective Subject Motel Location.

337. Each Motel Operator Defendant is responsible for the acts, omissions, and knowledge of all employees of its respective Subject Motel Location when operating the motel. As the facts alleged above show, these acts and omissions were committed in the course and scope of employment, each Motel Operator Defendant ratified these acts and omissions, and each Motel Operator Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to each Motel Operator Defendant, of sex trafficking occurring at its Subject Motel Location.

338. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at its Subject Motel Location, each Motel Operator Defendant continued renting rooms to these traffickers, including Caroline's trafficker and including the rooms used to sexually exploit Caroline.

339. Each Motel Operator Defendant knew or was willfully blind to the fact that Caroline was being trafficked and, despite this, benefited from continued association with her traffickers by receiving room rental revenue in exchange for providing motel rooms and related services, to facilitate Caroline's sexual exploitation.

340. Each Motel Operator Defendant facilitated the harboring, providing, maintenance, and exploitation of Caroline and other victims at its Subject Motel Location when it continued to provide rooms where they were imprisoned and exploited despite actual knowledge of or willful blindness to the fact that these victims were being trafficked at its Subject Motel Location.

341. Each Motel Operator Defendant also facilitated widespread trafficking at its Subject Motel Location, including the trafficking of Caroline, in ways including:

a. Failing to adequately enforce policies, procedures and practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to on-premises crime and specifically human trafficking;

b. Continuing to provide services and assistance to traffickers after observing obvious "red flags" of sex trafficking;

c. Following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

342. Through these actions, each Motel Operator Defendant formed a continuous business relationship with traffickers and encouraged them to return to its respective Subject Motel Location to exploit victims including Caroline.

THE FRANCHISE AGREEMENT MADE BHUVNESHWARI G6'S AGENT WITH RESPECT TO ON-SITE TRAFFICKING

343. Defendant Bhuvneshwari was the franchisee for the Motel 6 Claremont. Bhuvneshwari's knowledge obtained in that capacity is imputed to G6 based on the existence of an agency relationship as described below.

344. As franchisor, G6 provides its franchisees—including Bhuvneshwari—with signage on and in front of the building that is intended to reassure customers that, if they check into the hotel, they can expect an experience consistent with the standards of the franchisor's brand. The same branding is emblazoned on everything in the hotel, from the pens on the bedside table to the staff's uniforms.

345. Through its operative franchise agreement, G6 exercised systematic, day-to-day control over the operation of the Motel 6 Claremont and over the conduct of the employees who staffed it, including over the specific aspects of hotel operations through which Caroline was trafficked.

346. On information and belief, as franchisor, G6 required Bhuvneshwari to obtain its prior approval before hiring managers, and G6 reserved for itself the ability to withhold approval for any reason. G6 retained the authority to require Bhuvneshwari to hire hotel management companies preapproved by it.

347. On reference, as franchisor, G6 required Bhuvneshwari—as its franchisee—to use G6's proprietary computerized business systems, which.

a. Shared Bhuvneshwari's reservation data with G6;

b. Gave Bhunvneshwari access to G6's central reservation service, through which Bhuvneshwari was required to channel all reservations;

c. Housed the franchisee's property information and streamlined its property management tasks;

d. Housed and handled the Bhuvneshwari's revenue and expenditure management, including payment processing;

e. Housed and handled Bhuvneshwari's rate and inventory management;

f. Housed the franchisee's employee training records and connect the franchisee to franchisor-created and/or franchisor-approved training modules for its employees on a franchisor-determined schedule; and

g. Otherwise housed nearly all data and decision-making related to the day-to-day operation of the Motel 6 Claremont.

348. On reference, G6 required Bhuvneshwari to use specific revenue optimization software to guide Bhuvneshwari in pricing rooms and setting compensation for employees.

349. On information and belief, G6 required Bhuvneshwari to use the G6's preferred vendor to set up and maintain Wi-Fi for hotel guests. Thus, G6 controlled whether guests could access certain sites, and G6 has access to guests' browsing histories.

350. It is standard practice within the hospitality industry to require franchisees to purchase training for their employees from the franchisor. Such training is often required for all new employees. For management and other senior employees, franchisor-mandated trainings generally cover all aspects of running a hotel that lives up to the franchisor's brand standards.

351. By mandating particular trainings for particular job titles, franchisors effectively mandate that franchisees employ a standardized set of job titles and job responsibilities for their employees. On reference, G6 incorporated this standard practice into its operative franchise agreements with Bhuvneshwari covering the relevant period.

352. Generally, all employees who take part in the franchisor-mandated trainings must complete them to the franchisor's satisfaction. Because franchisors generally require all franchisee employees to complete at least one training within weeks after being hired, franchisors generally have an absolute veto over all franchisee employee hires. On reference and belief, G6 incorporated this general practice into its operative franchise agreements with Bhuvneshwari covering the relevant period.

353. In particular, on reference, G6 required Bhuvneshwari to employ a general manager who completed G6's training program, including trainings related to human trafficking, to G6's sole satisfaction.

354. On information and belief, G6 provided their franchisees, including Bhuvneshwari, with sample employment agreements and lists of job responsibilities, giving them effective control over most aspects of their franchisees' employees' employment.

355. During the relevant period, G6 prevented their franchisees, including Bhuvneshwari, from maintaining their own websites, and they each required that all online bookings be handled through the franchisor's own central booking system.

356. G6 generated substantial revenue from the operation of Motel 6–branded hotels, including the Motel 6 Claremont. In exchange for the services, systems, and standards it provided and enforced, G6 received a share of the revenue collected at the Motel 6 Claremont. Because the fees G6 collected were based primarily on gross room revenue, G6's revenue increased with every room rented at the Motel 6 Claremont—including the rooms rented to traffic Caroline.

357. G6 and Bhuvneshwari engaged in revenue sharing and had a common incentive to maximize room revenue, including revenue generated specifically by renting rooms to traffickers. G6 thus knowingly benefited, within the meaning of 18 U.S.C. § 1595(a), each time a room was rented at the Motel 6 Claremont, including each room rented to Caroline's trafficker.

358. G6 has publicly assumed responsibility and control over the human trafficking response of all G6 properties, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

359. By monitoring and critiquing branded hotels' interactions with law enforcement, G6 retained effective control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels.

360. On information and belief, G6 further retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human

trafficking to G6. G6 then determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

361. G6 retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

362. G6 retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. G6 determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

363. G6 is responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Motel 6 Claremont location

364. On information and belief, G6 retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Motel 6 Claremont location, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

365. G6 collected, maintained, and analyzed detailed data regarding housekeeping services at the Motel 6 Claremont location, including trends that would reveal patterns consistent with human trafficking.

366. G6 controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

367. G6 directly made reservations for rooms at the Motel 6 Claremont location and accepted payment for those rooms through a central reservation system that they controlled and operated. Wyndham could reserve rooms and accept payments without requiring franchisee approval or involvement.

368. G6 established and maintained control over a brand-wide “do not rent” system. G6 set all policies related to use of this system and dictated the day-to-day details of reservations at

the Motel 6 Claremont location through detailed policies that it established regarding use of this "do not rent" system.

369. On information and belief, G6 controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation.

370. G6 collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Motel 6 Claremont location

371. Through the systems, standards, training, monitoring, and reporting requirements described above, G6 retained and exercised day-to-day control over the means and methods by which Bhuvneshwari and its employees operated the Motel 6 Claremont. Bhuvneshwari and its staff acted as G6's actual agents in performing the functions G6 controlled, and the knowledge those employees acquired in the course of operating the hotel—including knowledge of the red flags of Caroline's trafficking—is imputed to G6.

## G6 HAD, OR SHOULD'VE HAD, DIRECT KNOWLEDGE OF TRAFFICKING AT THE MOTEL 6 CLAREMONT

372. Aside from imputed knowledge, G6 itself knew or should have known, throughout the relevant period, that its franchise locations played host to at least thousands and likely many tens of thousands of instances of sex trafficking each year.

373. Upon information and belief, G6 also knew or should have known about the widespread trafficking—and specifically Caroline's trafficking—at the Motel 6 Claremont referenced herein, based on:

a. The obligation of hotel staff and hotel management to report suspected criminal activity, including sex trafficking, to G6;

b. G6's regular monitoring of online reviews;

c. G6's collection and monitoring of customer surveys and complaints;

d. G6's regular inspections of the hotel property;

e. G6's use of field agents who worked directly with the Motel 6 Claremont, including through on-site work on security issues;

f. Collection and monitoring of data about guests at the Motel 6 Claremont, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

g. Supervision and control over day-to-day operations of the Motel 6 Claremont through detailed information and extensive reports that it obtained through the property management system and other software systems it required Bhuvneshwari to use and through which Bhuvneshwari was obligated to allow G6 to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

h. News articles and governmental statements reflecting extensive community criticism of the Motel 6 Claremont;

i. Information provided to G6 by law enforcement; and

j. Other sources of information available to G6.

374. On information and belief, G6 required Bhuvneshwari to give G6 complete and unfettered remote access to all information stored in its proprietary computerized business systems during the relevant time period. Thus, on reference and belief, anytime a Bhuvneshwari employee input an electronic note or took any action that affected the hotel's inventory, reservations, revenue, or personnel, G6 knew about it.

375. It is a standard practice in the hospitality industry for franchisors to expressly retain the right to detect criminal activity using the data supplied by its control over franchisees' computer systems, as well as the right to turn over any evidence of criminal activity to law enforcement. On reference, G6 incorporated this general practice into its operative franchise agreements with Bhuvneshwari covering the relevant period.

376. It is a standard practice in the hospitality industry for franchisors to monitor all guest reviews and complaints on online platforms, and for franchisors to charge franchisees a fee if they fail to respond promptly to a negative review on third-party travel websites. On reference, G6 incorporated this general practice, called a "Customer Care Fee" into its operative franchise agreements with Bhuvneshwari covering the relevant period.

377. G6 observed obvious "red flags" of numerous instances of sex trafficking occurring at the Motel 6 Claremont based on supervision and monitoring of the property through the above-listed tools, especially their monitoring of guest registration activity and housekeeping activity.

378. On information and belief, G6 required Bhuvneshwari and its staff to report suspected criminal activity at the Motel 6 Claremont location, including suspected sex trafficking, to G6.

379. On information and belief, in compliance with G6's protocols, staff at the Motel 6 Claremont did report numerous instances of suspected sex trafficking to G6 prior to Caroline's trafficking based on the numerous red flags exhibited by these prior victims who were exploited at the Motel 6 Claremont.

380. On information and belief, some of these reports concerned Caroline's specific trafficker and his prior victims whom he had brought to the Motel 6 Claremont.

381. On information and belief, staff at the Motel 6 Claremont similarly reported their suspicions about Caroline's own trafficking to G6.

382. On information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Motel 6 Claremont, G6 continued participating in a venture with Bhuvneshwari, its staff, and the traffickers whose trafficking they facilitated, by:

a. adopting inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

b. providing inadequate training on issues related to human trafficking and unreasonably delaying providing training;

c. adopting a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Wyndham properties;

d. continuing to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Motel 6 Claremont location;

e. affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

f. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the Motel 6 Claremont location, declining to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

g. allowing traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability;

h. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers to operate with minimal risk of traceability.

383. G6 received benefits, including increased revenue, every time a room was rented at the Motel 6 Claremont, including when rooms were rented to Caroline's trafficker for her trafficking.

## CAUSES OF ACTION

COUNT I: PERPETRATOR LIABILITY UNDER 18 U.S.C. § 1595

(MOTEL OPERATOR DEFENDANTS)

384. Plaintiff incorporates each foregoing and subsequent allegation.

385. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and 1595 and is thus entitled to bring a civil action under 18 U.S.C. §1595.

386. Through their acts and omissions described above, the Motel Operator Defendants are each "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a), and they are thus liable under 18 U.S.C. § 1595.

387. Through their acts and omissions described above, the Defendants each benefit[ted] financially from Plaintiff's sex trafficking due to their participation in a venture that they knew or should have known earned money from sex trafficking, and they are thus liable under 18 U.S.C. § 1595.

388. Each Motel Operator Defendant:

a. violated 18 U.S.C. § 1591(a)(1) when, through the acts and omissions described above, it harbored Plaintiff (and other victims) knowing or in reckless disregard of the fact that she (and other victims) would be caused, through force, fraud, or coercion, to engage in commercial sex acts while at its hotel property; and

b. violated 18 U.S.C. § 1591(a)(2) when, through the acts and omissions described above, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations of § 18 U.S.C. § 1591(a)(1) at its hotel property.

389. Violations of 18 U.S.C. § 1595(a) by each Motel Operator Defendant as a "perpetrator," operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Motel Operator Defendants' hotel properties.

## Count II : Beneficiary Liability under 18 U.S.C. § 1595

(All Defendants)

390. Plaintiff incorporates herein each foregoing and subsequent allegation.

391. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and 1595 and is thus entitled to bring a civil action under 18 U.S.C. §1595.

392. Through their acts and omissions described above, each Defendant received financial benefits, including but not limited to room rental fees, from participating in a venture with traffickers, including Plaintiff's trafficker, despite the fact that each Defendant knew or should have known that these traffickers, including Plaintiff's trafficker, had engaged in violations of 18 U.S.C. § 1591(a)(1 & 2).

393. Defendant G6, specifically, received financial benefit, including but not limited to a percentage of room rental fees, from participating in a franchise venture with Defendant Bhuvneshwari, despite the fact that Defendant G6 knew or should have known that Bhuvneshwari had engaged in violations of 18 U.S.C. § 1591(a)(1 & 2) as further described in Count I, *supra*, and the other allegations of this Complaint.

394. Violations of 18 U.S.C. § 1595(a) by each Defendant as a "beneficiary," operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties

## Count III : Vicarious Liability for TVPRA Violations

(G6)

395. Plaintiff incorporates each foregoing and subsequent allegation.

396. Through the acts and omissions described above, Defendant G6 exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Defendant Bhuvneshwari to operate the Motel 6 Claremont, especially the specific aspects of those operations that caused Plaintiff's harm as described above.

397. Under the TVPRA and federal common law, the principal is vicariously liable for the violations of its actual agents and its subagents. G6 is thus vicariously liable for the TVPRA

violations of Bhuvneshwari and its subagents.

398. Furthermore, through the acts and omissions described above, Defendant G6 exercised or retained the right to exercise systematic control over conditions of employment of the Motel 6 Claremont's staff (including influence or control over their job titles and responsibilities, their rates of pay, and especially their training).

399. Defendant G6 was thus a joint employer of the Motel 6 Claremont's staff, both in general and specifically with respect to their handling of suspected human trafficking incidents. G6 is thus vicariously liable for those employees' acts and omissions, whether or not Bhuvneshwari was itself G6's agent.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

- **a.** Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;
- **b.** Disgorgement of profits and/or restitution;
- **c.** Punitive damages, attorneys' fees, and expenses;
- **d.** The costs of this action;
- **e.** Pre- and post-judgment interest; and
- **f.** Any other relief the Court or jury deems appropriate.

DATED: August 10, 2026.

**KOHAN & BABLOVE, LLP**

______________________________

Nicholas Kohan, Esq. (SBN 257134)
20371 Irvine Ave, Ste 110
Newport Beach, CA 92660
Telephone: (949) 535-1241
Fax: (949) 535-1449
Email: nkohan@kbtriallawyers.com

**HILTON PARKER LLC**
Geoffrey C. Parker (*pro hac vice* forthcoming)
Jonathan L. Hilton (*pro hac vice* forthcoming)
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Telephone: (614) 992-2277
Fax: (614) 927-5980
Email: gparker@hiltonparker.com

**THE702FIRM**
Michael C. Kane (*pro hac vice forthcoming)*
8335 W. Flamingo road
Las Vegas, NV 89147
Telephone: (702) 776-3333
Fax: (702) 505-9787
Email: mckteam@the702firm.com

*Attorneys for Plaintiff Caroline V.*

**DEMAND FOR JURY TRIAL**

Plaintiff Caroline V., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED: August 10, 2026.

**KOHAN & BABLOVE, LLP**

____________________________

Nicholas Kohan, Esq. (SBN 257134)
20371 Irvine Ave, Ste 110
Newport Beach, CA 92660
Telephone: (949) 535-1241
Fax: (949) 535-1449
Email: nkohan@kbtriallawyers.com

**HILTON PARKER LLC**
Geoffrey C. Parker (*pro hac vice* forthcoming)
Jonathan L. Hilton (*pro hac vice* forthcoming)
7658 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Telephone: (614) 992-2277
Fax: (614) 927-5980
Email: gparker@hiltonparker.com
jhilton@hiltonparker.com

**THE702FIRM**
Michael C. Kane (*pro hac vice forthcoming)*
8335 W. Flamingo road
Las Vegas, NV 89147
Telephone: (702) 776-3333

Fax: (702) 505-9787
Email: mckteam@the702firm.com

*Attorneys for Plaintiff Caroline V.*